EXHIBIT "C"

SUM-100

## SUMMONS
### (CITACION JUDICIAL)

RECEIVED

AUG 0 2 2007

LEGAL DEPARTMENT

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Federal Express; FedEx Express

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

ENDORSED
FILED
ALAMEDA COUNTY

JUL 3 9 2007

CLERK OF THE SUPERIOR COURT
BY YASMIN SINGH, Deputy

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Brian Patrick Tucker
This summons is for a First Amended Complaint

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.  A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Wiley W. Manuel Courthouse
661 Washington Street, Oakland, CA 94607

| CASE NUMBER:<br>*(Número del Caso):* | HGO07311338 |
| --- | --- |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brian Patrick Tucker 14178 Tiburon Rd San Leandro, Ca. 94577
510-315-0497

DATE:
*(Fecha)*                                        Clerk, by _____, Deputy
                                                 *(Secretario)*              *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons *(form POS-010).)*
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, *(POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
[SEAL]
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* Federal Express

under:  ☑ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
        ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
        ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
        ☐ other *(specify):*
4. ☑ by personal delivery on *(date):*

Page 1 of 1

EXHIBIT C PAGE 11

1 | Brian Patrick Tucker
2 | 14178 Tiburon Rd,
  | San Leandro, Ca 94577
3 | 510-315-0497
4 | Pro Per

ENDORSED
FILED
ALAMEDA COUNTY

JUL 3 0 2007

CLERK OF THE SUPERIOR COURT
BY YASMIN SINGH: Deputy

5

6

7

8 | IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | IN AND FOR THE COUNTY OF ALAMEDA

10

11

12 | **Brian Patrick Tucker**

Plaintiff

Case No.    **HGO07311338**

13 | v.

**FIRST AMENDED COMPLAINT FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY; VIOLATION OF GOVERNMENT CODE §§ 12900, et seq (FEHA); BREACH OF CONTRACT; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

14

15 | Federal Express; FedEx Express and
   | Does 1 – 100 Inclusive

16 | Defendants

17

18 | Plaintiff alleges:

19 | **Facts Common to All Causes of Action**

20 | 1.    Plaintiff was employed by the Defendants at their facility at the Oakland,

21 | California International Airport from October 8, 2001 until February 15, 2006.

22 | 2.    Federal Express (Federal Express) is a duly constituted corporation which, at all

23 | times relevant to this lawsuit was doing lawful business within the jurisdiction of the County of

24 | Alameda, in the State of California.

25 | 3.    FedEx Express (FedEx) is a duly constituted corporation which, at all times

26 | relevant to this lawsuit was doing lawful business within the jurisdiction of the County of

27

28

EXHIBIT C , PAGE 12

1    Alameda, in the State of California, and is a wholly owned subsidiary corporation of Federal

2    Express.

3        4.        The identities and capacities of Does 1 through 100 inclusive are unknown to

4    Plaintiff and Plaintiff will amend this complaint to include them by name when such identity is

5    revealed to him. Such Does Defendants were agents and employees of FedEx Express and were,

6    at all times relevant to this lawsuit, acting in the course and scope of their employment with said

7    corporate Defendant.

8        5.        Plaintiff is informed and believes, and thereon alleges, that Defendants, and each of

9    them, are subject to suit under the California Fair Employment and Housing Act ("FEHA"),

10    Government Code §§ 12900, *et seq.*, in that they, and each of them, are employers of one or more

11    employees or the employees and agents of such employers.

12                          **General Allegations**

13        6.        On or about February 4, 2006 an individual came into Plaintiff's work area and

14    interfered with Plaintiff's work. Plaintiff took his complaint about this individual in writing to his

15    management personnel on duty, who at that time happened to be Perry and Mark Scates, who was

16    the management employee for whom the offending employee worked.

17        7.        Plaintiff had been instructed in writing to act in precisely this manner when he was

18    harassed by other employees. Plaintiff had been recruited by FedEx management to fill precisely

19    the position he was filling in the ULD By-Pass Lot and had been given responsibilities for which

20    said position was admittedly inadequate. Plaintiff was required, in the performance of his duties to

21    direct the activities of others. Mark Fraser had informed Plaintiff on numerous occasions that the

22    position should never have been filled by an employee of the level of authority that Plaintiff's

23    position was. Plaintiff was classified as a Materials Handler and such a position was equal in

24    authority to all other Material Handlers in the facility. No authority to direct the activities of

25    others was inherent in the classification of the position of Materials Handler. Other Materials

26    Handlers could not be regarded as insubordinate to Plaintiff if they refused his instructions.

27    Plaintiff was, nevertheless, instructed by FedEx to so direct such other employees in their

28    activities and to do so under the vicarious authority of FedEx management personnel. Such

- 2 -

EXHIBIT __C__  PAGE _13_

1  management personnel who gave such vicarious authority to Plaintiff were Chaiyuth Muangkieng,

2  who initially recruited Plaintiff for the position, and Paulo Felise. Such other employees were

3  inconsistent in their compliance with Plaintiff's instructions to them and Plaintiff, on numerous

4  occasions, complained to FedEx management personnel about such other individuals. Plaintiff's

5  responsibilities extended to the whole of the operation of the ULD By-pass Lot and the freight

6  within its specifically defined perimeter. Plaintiff's nightly tasks were very time sensitive. He

7  began his shift at 1:30 AM and was required to have freight delivered to staging areas on the

8  Flight Ops Ramp on time for said freight to be loaded onto aircraft with very specific departure

9  times, some as early as 5:15 AM. Plaintiff performed his job perfectly. He consistently scored,

10  year in and year out, the highest possible score in management evaluations of his performance in

11  the essential functions of his job, i.e. tracking freight in and out of the ULD By-Pass Lot and

12  timely delivery of said freight to the proper staging area proximate to the aircraft it was to be

13  loaded upon. Such time sensitive responsibilities required of Plaintiff that he assert himself when

14  he felt that others were interfering with his performance of his job. Such assertion of personal

15  responsibility was technically outside of the chain of command within FedEx hierarchy. Among

16  the personnel assigned to Ramp Operations, Ramp Agent and Team Leader were the only

17  classifications which could assert any authority stronger than mere suggestions to other personnel.

18  Plaintiff was, therefore, constantly faced with the predicament that he had to assert himself in time

19  constrained situations where an individual refused his instructions and such refusal severely

20  impacted the performance of his duties, but where he would be complained about, should his

21  assertion prove to hurt the feelings of the individual with whom such assertion became necessary.

22  Such assertion seemed to often hurt the feelings of others. On a few occasions Plaintiff was

23  required to explain why he had hurt the feelings of others. On each such occasion Plaintiff

24  explained to management that such hurt person had interfered with Plaintiff's performance in the

25  operation of the ULD By-Pass Lot and that individuals intent on interfering with the operation did

26  not belong in the ULD By-Pass Lot and were either told to do as they were asked or told to leave.

27       8.       This specific above-referenced complaint of Plaintiff's about an individual who

28  was interfering with the operation of the ULD By-Pass Lot was used by the Defendants to issue to

-3-

EXHIBIT  C  , PAGE  14

1  Plaintiff a disciplinary letter to his personnel jacket, such disciplinary letter which was issued on
2  February 15, 2006, and the Defendants subsequently exercised their option to terminate Plaintiff's
3  employment with them for having received his third such disciplinary letter in the time span of a
4  year, executing this termination on February 15, 2006, immediately, meaning within seconds, of
5  issuing the third disciplinary letter. Such third disciplinary letter in the time span of a year was the
6  stated cause for terminating Plaintiff's employment with FedEx.

7      9.    At the end of the combined discipline and termination procedure, which was
8  executed in person with Plaintiff by Mark Fraser at the FedEx facility in question, Plaintiff
9  informed Mr. Fraser that he wished to appeal this entire matter. Mr. Fraser took Plaintiff upstairs
10  to the reception area outside of the locked door to the personnel department, left Plaintiff there,
11  went through the door and re-emerged momentarily with an appeal form. Plaintiff took this form
12  with him and, later that day filled it out and in compliance with the instructions on the form,
13  addressed it, stamped it and mailed it to the address provided. On the way to the personnel office,
14  and after Plaintiff had informed Fraser of his desire to initiate the internal grievance procedure
15  offered under his contract with FedEx, Plaintiff and Fraser passed by as many as six computer
16  terminals, any one of which could have been logged-on to by Fraser to initiate the appeals process
17  Plaintiff had requested of the internal grievance procedure. The same circumstance obtained on
18  the way downstairs from the personnel office.

19      10.    Plaintiff heard nothing regarding his appeal until he inquired about it some months
20  later and was informed that it had never been received. Plaintiff requested that he be allowed to
21  resubmit the form, as he had retained a copy of it, and was informed that it was now untimely.
22  Initiation of the internal grievance procedure was requested by Plaintiff. It proved wholly
23  inadequate to address the issues involved in Plaintiff's termination from employment.

24      11.    Plaintiff had previously accessed the grievance procedure when disciplined and
25  formally discussed problems with his manager, Mark Fraser, to no apparent avail. Plaintiff
26  exhausted his administrative remedies as well, by filing a FEHA complaint and receiving a Right-
27  to-Sue letter from DFEH.

28

- 4 -

EXHIBIT  C , PAGE  5

## First Cause of Action
### Wrongful Termination of Employment in
### Violation of Public Policy

12.    Plaintiff here includes in this cause of action paragraphs 1 through 11 inclusive as though they were written in their entirety.

13.    Plaintiff here includes in this cause of action any and all other sentences or paragraphs inclusive that may contain allegations or information that is pertinent to this cause of action as though they were written in their entirety.

14.    Plaintiff suffered injuries in the course and scope of his employment which were caused by contact of various parts of his hands with equipment owned, designed and maintained by Defendants and had his employment with Defendants terminated admittedly as a direct result of these injuries. Defendants did not provide safeguarding devices on their equipment to render it safe for Plaintiff to use. Such safeguarding device would have prevented Plaintiff's injuries.

15.    It is an employer's non-delegable responsibility under Labor Code §§ 6300, *et seq* to proactively maintain a workplace that is safe and healthful to its employees and it is utterly destructive of, it is fatal to the fundamental and well established public policy of the State of California, as expressed in its Constitution, to terminate the employment of qualified individuals who have been injured due to the failure of an employer to proactively perform its public duty and maintain such safe and healthful workplace. Defendants in the instant matter before this court terminated Plaintiff's employment with them because he received injuries in the course and scope of his employment and because he was required by Defendants, but not by Defendants' doctors, to be absent from work. Plaintiff's termination from his employment with Defendants was explicitly and expressly based on his industrial injuries, though not on any disability from those injuries that caused him to be permanently disabled and unable to perform his job, and on his absence from work due to those injuries, such absence which was caused entirely at the discretion of Defendants and was not due to the injury, per se.

-5-

EXHIBIT  C  PAGE 16

16.     It is the fundamental public policy of the State of California as stated in Section

132a of the Labor Code, that an employer not be allowed to discharge or discriminate in any

manner against employees who assert their rights to avail the workers compensation system.

Plaintiff was fired by Defendants for just such avail of his rights. Section 132a is not an exclusive

remedy. This cause of action concerns a more broadly expressed public policy than simply the

public policy against discharge and discrimination of industrially injured individuals expressed in

Labor code 132a, but it includes said public policy against discrimination expressed in 132a.

17.     On October 8, 2001 Plaintiff began his employment with FedEx. On or about

August 16, 2002 Plaintiff was specifically recruited for and reassigned by FedEx to what in

company nomenclature is referred to as "Cold Storage" and which also is referred to as the ULD

By-Pass Lot. Plaintiff continued with this assignment from that approximate date until his

termination from employment with FedEx occurring on February 15, 2006.

18.     Plaintiff's duties in this assignment included maintaining a handwritten tracking

log of the wheeled container units (Unit Loading Device/ULD) used to load packages and other

freight on board aircraft and other delivery vehicles for transport to the respective destinations

around the state and country of said ULD's, as said ULD's were routed through the ULD By-Pass

area. Plaintiff's other duties included the connection of these ULD's to one another within the area

of the ULD By-Pass Lot, in "strings," of as many as four to facilitate the efficient delivery of

ULD's to their respective flights. This required that Plaintiff physically pull ULD's individually

weighing up to ten-thousand pounds situated on wheeled "dollies" weighing an additional ton

themselves, from which said ULD was detachable, in a forward direction, manually guiding it

towards the rear of a stationary ULD so that the respective front and rear connecting mechanisms

on the dollies could be aligned and the entire apparatus connected as a train or string. Such

procedure required that Plaintiff simultaneously place his hands at the extremities of the

respective hitching mechanisms, i.e. of the "tongue" of the forward moving ULD, said "tongue"

which was an extension of approximately a four foot length projecting from the front of the

"dolly", of an iron bar used to attach a given forward moving "dolly" to another stationary "dolly"

positioned in front of it, and the rear hitch of said stationary ULD. The rear hitch of a ULD had a

-6-

EXHIBIT _C_ PAGE _17_

1    spring loaded pin which needed to be held up to tense the spring so that the thick, steel pin on the

2    rear hitch would not obstruct the passage into the rear hitch mechanism of the solid iron "tongue"

3    of the forward moving ULD. Such "tongue" had a horizontally flattened, circularly shaped, solid

4    steel front end with a two and half to three inch, machine cut hole and when this hole passed into

5    the rear hitch of the stationary ULD the tension on the spring of said rear hitch would be manually

6    released and the pin attached to the spring would drop into the hole in the "tongue" of the forward

7    moving ULD and the ULD's would be connected. The weight is allowed to be ten-thousand

8    pounds per ULD and the wheeled transport "dollies" from which the ULD is detachable are

9    always more than a ton themselves, making each ULD unit while in ULD By-Pass as much as

10    twelve thousand pounds or more, with all of the attendant laws of physics, regarding bodies in

11    motion and the forceful energy contained in their mass, pertaining, with regard to cessation of

12    such forward motion.

13        19.    Six ton ULD's, owned and maintained by Defendants for use in their business

14    operations, deliberately set in motion to facilitate connection with other ULD's at the FedEx

15    facility in question, are stopped by contact with the stationary ULD to which they are desired to be

16    connected and not by anything else, except perhaps dissipation of forward momentum should they

17    not eventually come into contact with anything after being set in motion. The point of contact is at

18    the respective front and rear hitching mechanisms. This was the established procedure for

19    connecting ULD's for the entire time Plaintiff was assigned to the ULD By-Pass Lot. This

20    procedure required physical strength and a sense of timing and required that an individual engaged

21    in the connection or disconnection procedure stand between the respective ULD's while one of

22    said ULD's was in motion and maintain physical contact with the hitching mechanism of each

23    ULD. Connection and disconnection procedures utilized manpower only. At the time of Plaintiff's

24    assignment to the ULD By-Pass Lot he was given no training in this procedure. He learned it by

25    observing the other individuals who had been given the same assignment to the ULD By-Pass Lot

26    in the few weeks prior to Plaintiff's assignment there, as well as learning it by doing it and

27    developing the requisite skills by repetition.

28

- 7 -

EXHIBIT _C_, PAGE _18_

1        20.    There were no safeguard devices or mechanisms, either manually or mechanically

2 operated, that were attached to the ULD apparatus that would mitigate or obviate the necessity to

3 place an individual's hands in immediate proximity to and in contact with the respective hitching

4 apparatus of each six ton mobile ULD dolly and the six ton stationary ULD dolly in order to

5 connect them. Such contact as described in the immediately preceding sentence was necessarily

6 maintained from the start of a connection procedure all the way through the entirety of the

7 procedure. An individual's hands had to remain in firm contact with the respective hitching

8 mechanisms until after the collision of the as much as twelve thousand pound mobile ULD with

9 the as much as twelve thousand pound stationary ULD. Furthermore, all ULD dollies were

10 idiosyncratic, with slight variations in hitching mechanism. These variations were not designed.

11 Very often while a ULD was at rest and unconnected to any other ULD its front hitching

12 mechanism, i.e. tongue, would simply rest on the ground and an additional effort while connecting

13 such a ULD dolly to another one was required to hold the tongue level with the rear hitching

14 mechanism of the ULD to which it was being connected. Such a ULD posed the danger that a

15 missed aim of the "tongue" in an underneath direction could cause the "tongue" to not come in

16 contact with any part of the front positioned ULD, such contact which was the only way to stop

17 the ULD, and, thereby, crush the lower legs of the individual attempting to connect the ULD's

18 between them. This is not what happened to Plaintiff, but it is indicative of the poor design and

19 maintenance of the equipment in question. The equipment was dangerous when used as designed.

20 The equipment was poorly maintained.

21        21.    An individual, in order to escape having his hands caught between ULD's while

22 connecting them, simply had to rely on the initial placement of his hands and his timing in moving

23 his hands out of the way in time, as Plaintiff managed to do forty-thousand to fifty-thousand

24 times, with only a single instance of injury, even though each and every successful or

25 unsuccessful attempt at connecting ULD's involved a massive collision of said ULD's with each

26 other. Mitigating or obviating injury while performing such connection procedure relied entirely

27 on the skill and proactive effort of the individual performing the procedure. The Labor Code

28 requires that the employer must be the proactive one and supply its equipment with effective

EXHIBIT  C , PAGE  19

1    safeguards and its employees with proper and specific training and such responsibility is non-

2    delegable by an employer.

3        22.    It is an employer's statutory and non-delegable responsibility to do everything

4    possible to provide a safe and healthful workplace for its employees. These responsibilities are

5    codified in Labor Code Division 5. There is no exclusive remedy provision to Division 5.

6        23.    On October 19, 2005 Plaintiff received the above-referenced industrial injury to the

7    fleshy part of his right palm, where the palm meets the pinky finger, while performing the above-

8    described procedure for connecting ULD's in precisely the same manner as he had for the tens of

9    thousands of times prior to this occasion that he so connected such ULD's. Plaintiff is right-

10   handed. This injury was a severe laceration which sliced through each layer of dermis and

11   lacerated the fatty tissue beneath it, but affected no muscle or tendon tissue, nor any bone. It

12   proved to be a temporary disability and Plaintiff returned back to work after a full recovery period

13   of merely twenty-one days.

14       24.    Again, Plaintiff performed the abovedescribed ULD connection procedure

15   approximately forty-thousand to fifty-thousand times between the initial date of his assignment to

16   the ULD By-Pass Lot and the instance of his injury and received only this single instance of

17   injury. This is an injury rate of .000020 to .000025, or .002 to .0025 percent. On several hundred,

18   or even several thousand, occasions Plaintiff was directly observed and even assisted by

19   supervisory, management and senior management personnel in performing this procedure,

20   including David Perry and Mark Fraser, his senior manager and his manager on the morning of

21   October 19, 2005. On the morning of October 19, 2005, the date of injury, an individual member

22   of the supervisory staff was present and in immediate proximity to where the injury occurred. This

23   man is named Patrick Atkins. At no time during his entire assignment to the ULD By-Pass Lot

24   was Plaintiff given any manner of instruction or training in how to perform this procedure

25   differently than he had always performed it, even when observed by management personnel

26   including Fraser and Perry, and this procedure was precisely the procedure he was using when his

27   timing, for whatever reason, proved slightly off on October 19, 2005, and he received his

28   industrial injury. One certain reason for the timing discrepancy was the assistance being given to

EXHIBIT  C , PAGE 20

1    Plaintiff, unbeknownst to him, by another individual, Peter Ath, who was pushing from the rear of

2    the ULD in a forward direction and causing the ULD to not stop its forward motion when Plaintiff

3    expected it to. Such unexpected continuation of forward motion by the ULD caused Plaintiff to

4    not move his right hand away from the apparatus in time to prevent it from being caught between

5    the hitching mechanisms. The hitching procedure depends more on timing than anything else.

6         25.    At approximately 5:30 AM on October 19, 2005 Plaintiff reported to the

7    emergency room at San Leandro Hospital and was given emergency treatment for his injury, such

8    treatment which consisted of cleansing and stitching the wound. Plaintiff was given a very short

9    period of total disability at this time and he reported this in person to his employer. In fact

10   Plaintiff was driven to the emergency room by Everado (last name unknown), who, at the time in

11   question was the ramp safety coordinator for Plaintiff's shift. Everado stayed with Plaintiff until

12   Plaintiff was released that morning and he drove Plaintiff back to the FedEx facility so that

13   Plaintiff could hand over paperwork regarding his industrial injury and then pick up his car.

14   Plaintiff's vehicle had a standard transmission and Plaintiff was, nevertheless, able to drive home

15   without difficulty.

16        26.    Plaintiff reported to the industrial injury practitioner required of him by FedEx in

17   the following days, on or about October 21, 2005, again driving himself using a vehicle with a

18   standard transmission.

19        27.    This practitioner examined Plaintiff's injury and prescribed physical therapy and

20   authorized Plaintiff to return to work with work restrictions. Plaintiff reported to work on October

21   25, 2005 to David Perry and provided him with the orders from the industrial injury practitioner.

22   Perry arbitrarily disallowed Plaintiff to return to work with those restrictions and Perry authorized

23   Plaintiff's absence from work for the duration of his recovery from these injuries. In May of 2005

24   Plaintiff had suffered a minor industrial injury that, nevertheless, had required a trip to the same

25   emergency room and for which he received stitches to the knuckle on the index finger of his left

26   hand. Plaintiff received the May 2005 injury while performing a disconnection procedure of

27   ULD's. No safeguard device was supplied to mitigate or obviate hazard to employees performing

28   such procedure. Plaintiff was immediately returned to work by the treating physician with work

- 10 -

EXHIBIT C   PAGE 21

1   restrictions that were identical to the work restrictions he was given by the treating physician for

2   his October 19, 2005 industrial injury. The identical restrictions were met with no problem by

3   FedEx concerning the May 2005 injury and Plaintiff missed no days from work in May 2005 as a

4   result of his industrial injury. Perry was Plaintiff's Senior Manager in May of 2005.

5         28.    Upon his return to work from the October 19, 2005 industrial injury, on or about

6   November 9, 2005, Plaintiff was flabbergasted to discover that Defendants intended to blame him

7   and that he would be disciplined by FedEx management personnel for committing an unsafe act

8   resulting in injury and, in combination with the unrelated and completely distinguishable

9   industrial injury suffered in May of 2005 and alluded to in the previous paragraph, Plaintiff was

10   given a performance reminder to his personnel jacket. Upon Plaintiff's return to work on

11   November 9, 2005, Fraser further required that Plaintiff submit an Action Plan of Plaintiff's own

12   devise, upon penalty of job loss, describing to FedEx how Plaintiff planned to avoid such injury in

13   the future. Plaintiff submitted to Fraser such plan. This Action Plan was the extent of Defendants'

14   efforts to mitigate future such injuries. Defendants required nothing of themselves.

15         29.    No suggestion of any kind whatever, nor action taken of any kind whatever, was

16   ever made by FedEx management personnel concerning how the company planned to comply

17   with its statutory responsibility to provide a safe and healthful workplace to Plaintiff and all other

18   of its employees, by mitigating the danger to such health and safety that their equipment posed,

19   even when being used in the manner prescribed by them, specifically their freight container

20   transport dollies, such danger being recognized by them, as Plaintiff had twice been injured within

21   a six month period performing prescribed connection and disconnection procedures on them and

22   others had been similarly injured. All mitigations of hazards and injury made in the matter were

23   required by FedEx to be made by Plaintiff and no responsibility for the condition and design of

24   their equipment nor the inadequacy of their prescribed methods for connecting or disconnecting

25   ULD transport dollies, such that such methods would obviate or mitigate against injury, was ever

26   considered by FedEx to be their responsibility. The only advice proffered by FedEx was that

27   Plaintiff be more careful. FedEx provided no safeguard device to obviate the dangers posed to the

28   health and safety of their employees by this FedEx owned and maintained equipment.

- 11 -

EXHIBIT C , PAGE 22

30.    Plaintiff resumed his work on November 9, 2005 and proceeded to connect ULD's in precisely the same manner he had when he was injured on October 19, 2005, with no further instruction on how to avoid such injury again and using equipment which was not equipped with a safeguarding device to mitigate the hazards posed to employees' health and safety. Plaintiff essentially returned to a situation which was the status quo ante to his injury, except that Plaintiff's industrial injuries would lead directly to the termination of his employment. The only thing FedEx did to address the conditions in its workplace which lead to Plaintiff's injuries was to discipline and fire him for them. Plaintiff was observed by supervisory as well as management personnel of FedEx performing this procedure perhaps another few hundred or even a thousand times after returning to work from the forced absence caused by his industrial injury, such injury for the receipt of which Plaintiff was disciplined by FedEx. Such individuals observing Plaintiff included each Ramp Agent assigned to the AM Shift, as well as managers Mark Scates and Mark Fraser. Plaintiff also observed other employees both exactly situated as Plaintiff and supervisory personnel performing such procedure in precisely the same manner as Plaintiff did after returning from his period of disability, all without the slightest concern exhibited by FedEx and its management personnel and certainly no disciplinary action taken against them, even though FedEx considered this connection procedure to be dangerous. Neither did Defendants outfit this equipment with safeguarding devices after Plaintiff had been injured.

31.    Plaintiff had extensive frank and open discussions with his manager, Mark Fraser, in regard to this incident, as per Defendants' policy regarding employees who are the recipients of unwarranted discipline, in the days following his return to work and the attempt to blame and discipline him for his injury. Plaintiff utterly rejected Defendants' attempted illegal discipline against him in these discussions with Fraser and Plaintiff left such discussions satisfied that Fraser understood he could not discipline Plaintiff for his injuries. Plaintiff informed Fraser in these conversations of the "no-fault" principles underpinning the "compensation bargain" which forms the basis of the public policy from which the Workers' Compensation system is derived. Plaintiff informed Fraser of the "assumption of risk" doctrine and the specific inapplicability of such doctrine, as well as the "contributory negligence" doctrine, for employers in formulating policies

- 12 -

EXHIBIT  C , PAGE 23

1  with regard to industrial injuries. Plaintiff stated to Fraser his certain belief that Defendants'

2  insistence on blaming Plaintiff for his injury was motivated by Defendants' efforts to minimize

3  their workers' compensation insurance premiums by intimidating their employees, with Plaintiff

4  as a specific example, from filing claims. Plaintiff informed Fraser in these discussions that, under

5  no circumstances could an employer blame an injured employee for receiving his injuries under

6  such doctrines as referred to immediately prior in this paragraph.

7       32.    Unbeknownst to Plaintiff until February 1, 2006, he also had the first five absences

8  taken under doctor's orders to recover from his injury counted against his attendance record, such

9  absences which were caused entirely because of Perry's unilateral and arbitrary refusal to allow

10  Plaintiff's work limitations to be accommodated, as Plaintiff was medically authorized to work

11  and had appeared at work willing to resume his duties under the physician prescribed limitations.

12  Plaintiff had a perfect right under the Constitution of the State of California to follow his

13  physician's medical advice regarding said physician's course of treatment for Plaintiff's industrial

14  injury. Plaintiff fully healed from this injury within mere weeks and has not the slightest

15  permanent disability whatsoever resulting from it.

16      33.    On December 26, 2005 Plaintiff was on his way home from work at FedEx when

17  he became the victim of another's negligent operation of their motor vehicle. Plaintiff received

18  injuries in this accident which caused total disability for a period of twenty-eight days, but from

19  which he fully recovered. Plaintiff was absent both from FedEx and from the job he held during

20  daylight hours, for this period. These injuries were non-industrial.

21      34.    FedEx added the first five days of absence from this non-industrial injury to the

22  first five days of absence Defendants managerial personnel insisted Plaintiff take from the

23  October 19, 2005 industrial injury and, in combination with three other absences due to minor

24  illnesses over the prior twelve months to early January of 2006, on February 1, 2006 gave Plaintiff

25  a disciplinary letter to his personnel jacket for unsatisfactory attendance. Plaintiff did not qualify

26  for coverage under the Family and Medical Leave Act, having worked for only approximately

27  twelve-hundred and twenty-five hours of the requisite twelve-hundred and fifty hours within the

28  year's time prior to the fifth day of absence from the non-industrial injury. Though he did not

EXHIBIT   C   PAGE  2 ⊻

1    realize it, Plaintiff now had two active disciplinary letters in his personnel jacket on February 1,

2    2006, both of which resulted from disciplinary actions taken by Defendants with specific regard to

3    industrial injury suffered by Plaintiff. Both of these disciplinary letters were the direct result of

4    Defendants' failure to maintain a safe and healthy workplace, such failure which resulted in injury

5    to Plaintiff and loss of time from work to heal from injury.

6          35.    Without using the days of absence caused by the industrial injury Defendants could

7    not reach the requisite number of absences under their attendance policy to justify disciplining

8    Plaintiff for absenteeism. Furthermore, under Defendants' personnel policy, unauthorized absence

9    does not automatically count against an employee's attendance record. Defendants allow

10   themselves discretion in executing this policy and consider the context of the absence and whether

11   or not a trauma has occurred in the employee's life.

12         36.    The General provisions of Division 4 of the Labor Code, section 3201 reads: "This

13   division and Division 5 (commencing with Section 6300) are an expression of the police power

14   and are intended to make effective and apply to a complete system of workers' compensation the

15   provisions of Section 4 of Article XIV of the California Constitution."

16         37.    The General provisions of Division 4 of the Labor Code, section 3202 further

17   reads: "This division and Division 5 (commencing with Section 6300) shall be liberally construed

18   by the courts with the purpose of extending their benefits for the protection of persons injured in

19   the course of their employment." There is no exclusive remedy provision to Division 5 of the

20   Labor Code.

21         38.    Section 4 of Article XIV of the California Constitution reads: "The Legislature is

22   hereby expressly vested with plenary power, unlimited by any provision of this Constitution, to

23   create, and enforce a complete system of workers' compensation, by appropriate legislation, and in

24   that behalf to create and enforce a liability on the part of any or all persons to compensate any or

25   all of their workers for injury or disability, and their dependents for death incurred or sustained by

26   the said workers in the course of their employment, irrespective of the fault of any party. A

27   complete system of workers' compensation includes adequate provisions for the comfort, health

28   and safety and general welfare of any and all workers and those dependent upon them for support

- 14 -

EXHIBIT __C__ PAGE __25__

1   to the extent of relieving from the consequences of any injury or death incurred or sustained by

2   workers in the course of their employment, irrespective of the fault of any party; **also full**

3   **provision for securing safety in places of employment**; full provision for such medical, surgical,

4   hospital and other remedial treatment as is requisite to cure and relieve from the effects of such

5   injury; full provision for adequate insurance coverage against liability to pay or furnish

6   compensation; full provision for regulating such insurance coverage in all its aspects, including

7   the establishment and management of a state compensation insurance fund; full provision for

8   otherwise securing the payment of compensation; and full provision for vesting power, authority

9   and jurisdiction in an administrative body with all the requisite governmental functions to

10  determine any dispute or matter arising under such legislation, to the end that the administration of

11  such legislation shall accomplish substantial justice in all cases expeditiously, inexpensively, and

12  without incumbrance of any character; all of which matters are expressly declared to be the social

13  public policy of this State, binding upon all departments of the state government."

14          39.     Division 4 of the California State Labor Code governs the no-fault system of

15  compensation for individuals receiving industrial injuries. The exclusive remedy provision of

16  Division 4 of the Labor Code bars personal injury lawsuits against employers when the conditions

17  of compensation are met. Plaintiff has no other recourse nor seeks no redress for the personal

18  injuries he suffered due to Defendants' negligent maintenance of their workplace. Plaintiff seeks

19  redress for Defendants' deliberate acts that denied Plaintiff his rights under the public policies of

20  this state.

21          40.     Division 5 of the California State Labor Code states the non-delegable

22  responsibilities of employers to provide for their employees a safe and healthful workplace.

23          41.     Plaintiff received an industrial injury on October 19, 2005 and was disciplined

24  twice for that single instance of injury, such injury which resulted from his handling of

25  mechanical equipment provided to him by his employer, the maintenance of which, in a manner

26  ensuring the safety and health of individuals who would handle such equipment, it is the sole and

27  legal responsibility of employers in this state. Plaintiff handled this equipment in a manner

28  entirely according to procedures long established by his employer, such procedure obtaining in

- 15 -

EXHIBIT __C__, PAGE 26

1   precisely the same manner both prior to this injury as well as after recovery from this injury, and
2   in a manner in which he had handled said equipment as many as fifty-thousand times before
3   receiving said injury and hundreds or thousands of more times after recovery from this injury
4   without a single objection by his employer, said employer which knew perfectly well how
5   Plaintiff performed this procedure, and his employment with FedEx Express was terminated as a
6   direct result of these disciplinary actions. This termination of employment was in direct violation
7   and was completely destructive of the public policy of the State of California, as such public
8   policy is expressed in Section 4 of Article XIV of the California Constitution, to require that
9   employers maintain a safe and healthy workplace for their employees and that they not
10  discriminate against employees injured while in the course and scope of their employment.

11      42.    Because of defendants' conduct Plaintiff has suffered monetary damages in an
12  amount to be proven, but which includes backpay and benefits of employment as well as frontpay
13  and benefits and which must consider the destruction of Plaintiff's finances and credit, the
14  reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff
15  seeking employment with Defendants in the first place..

16      43.    Because of defendants' conduct Plaintiff has suffered consequential damages in an
17  amount to be proven, but which must consider the destruction of Plaintiff's finances and credit,
18  the reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff
19  seeking employment with Defendants in the first place.

20      44.    Because of defendants' conduct Plaintiff has suffered emotional damages in an
21  amount to be proven, but which include the worry and despair Plaintiff has experienced at the
22  destruction of his finances, as well as the development by Plaintiff of a horrendous and seemingly
23  chronic insomnia, such condition for which Plaintiff has sought medical attention.

24      45.    Because of defendants' conduct Plaintiff has suffered other, unspecified damages
25  in an amount to be proven.

26      46.    Because defendants' conduct was intentional, malicious and cruel and
27  unconscionable, an amount of punitive and exemplary damages should be awarded to Plaintiff to
28  deter such unmitigated cruelty by FedEx and other employers against their employees in the

- 16 -

EXHIBIT  C  PAGE 27

1    future. Such damages are warranted against FedEx because they were perfectly aware of the

2    physical dangers posed to their employees in their workplace by such activity as caused Plaintiff's

3.   injuries. Plaintiff was injured in May of 2005 and this injury was explicitly regarded by FedEx to

4    be an identical type of injury to the injury Plaintiff suffered on October 19, 2005, such that, in

5    FedEx' expressly stated opinion, Plaintiff was exhibiting a pattern of behavior posing a danger to

6    himself and presumably others. Nevertheless, FedEx took no action to mitigate the unsafe

7    conditions in their workplace beyond scolding and disciplining Plaintiff for receiving both of

8    these injuries, such discipline presumably acting as a deterrent and as a negative incentive to

9    Plaintiff to refrain from being injured again. No safeguarding devices mitigating against such

10   injury have ever been installed by FedEx on its ULD transport dollies, in spite of their perfect

11   awareness that their equipment is dangerous. Furthermore, a FedEx employee named Antonio

12   Villareal received injuries to his hand in precisely the manner which Plaintiff did. This injury was

13   suffered by Antonio in 2003, though Plaintiff cannot pinpoint the date. After Antonio's injury no

14   safeguarding devices mitigating against such injury were installed by FedEx on its ULD transport

15   dollies. Had such devices been installed Plaintiff would not have been injured. Had Plaintiff not

16   been injured, he would not have had his employment with Defendants terminated. It is the

17   deliberate action taken by Defendants to terminate Plaintiff's employment and the personnel

18   policies leading to it and not negligence on Defendants' part that lead to the injury itself that

19   warrant the imposition of these punitive damages. Because of its perfect awareness of its

20   dangerous workplace and its intentional and callous disregard of such conditions, as well as its

21   absolute obligation to address such conditions and its utter failure to so address such conditions

22   FedEx employees continued to be injured. Because of the termination of Plaintiff's employment

23   as the direct consequence of such malicious disregard of its legal obligations towards him and his

24   rights under the law, entirely aside from the danger of physical injury Plaintiff and all other

25   employees were and continue to be put in, FedEx has demonstrated its unfitness as an employer in

26   this state and this state should punish FedEx to discourage it from continuing to pose such dangers

27   to the citizens of this state who may find themselves in Defendants' employ, and to correct its

28   despicable behavior, by allowing the abovesaid award of punitive damages.

- 17 -

EXHIBIT __C__ PAGE 28

## Second Cause of Action

## Breach of Contract

47. Plaintiff here includes in this cause of action paragraphs 1 through 11 inclusive as though they were written in their entirety.

48. Plaintiff here includes in this cause of action any and all other sentences or paragraphs inclusive that may contain allegations or information that is pertinent to this cause of action as though they were written in their entirety.

49. Defendants maintain a "no lay-off" policy.

50. On October 8, 2001 Plaintiff entered into an employment contract with FedEx. The employees at this FedEx facility were not covered by a collective bargaining agreement. Plaintiff was given the promise of payment of wages in exchange for the execution of specific duties as assigned by his equal partner to this contract, FedEx, as represented by its management personnel. Plaintiff fulfilled his obligations under this bargain perfectly and in exchange he received a weekly paycheck. It was stated at the time of hire that there was an at-will arrangement.

51. In June of 2002 Plaintiff was approached by Chaiyuth Muangkieng (Chai), who had previously been his manager and who had been reassigned to a "flight-side" management position. Chai specifically approached Plaintiff to recruit him for a position in the ULD By-Pass Lot. Chai informed Plaintiff that the ULD By-Pass operations were a crucial aspect of the overall "flight-side" operation and the success of operations at that FedEx facility. Chai informed Plaintiff that the position came with a great deal of responsibility and that he had designed the position to be filled by employees of high quality and good judgment and that he immediately thought of Plaintiff to fill one of the three positions of the operation. Extra responsibilities, but no promotion, accompanied the position. Plaintiff remained a "Materials Handler" in the vague nomenclature of the company regarding job assignments. This responsibility consisted entirely in making certain that freight was properly directed and that it was "flight ready." Chai informed Plaintiff in September or October of 2002 that should Plaintiff need assistance with any aspect of the operation and if Plaintiff observed individuals in the ULD By-Pass Lot area who were not engaged in otherwise assisting the operation, Plaintiff was authorized to compel such individuals

- 18 -

EXHIBIT ___C___ PAGE 29

1   under Chai's authority as ULD By-Pass Lot Manager to assist him. Such compulsion consisted of
2   directly requesting of individuals that they assist Plaintiff in his tasks while they were present in
3   the ULD By-Pass Lot and initiating possible disciplinary measures against such individuals should
4   they refuse, by reporting such conduct to Chai, who would investigate such matters. Plaintiff was
5   required under the terms of his contract with FedEx to direct the activities of other individuals.

6        52.    In January of 2003 additional personnel were assigned to staff the ULD By-Pass
7   Lot. Four individuals were newly hired to supplement the staff of three already present in the
8   "flight-side" side of the ULD By-Pass Lot operation. At the introduction of these new personnel to
9   the current staff, Chai informed the new personnel that Plaintiff and the other two individuals
10  comprising the current staff were authorized to direct their activities.

11       53.    In the course over the years of performing the terms of this contract Plaintiff
12  experienced more than occasional instances wherein individuals not parties to this contract
13  interfered with his ability to satisfy his obligations to his equal partner to this contract, FedEx, by
14  ignoring Plaintiff's directions concerning the operation of the ULD By-Pass Lot. Plaintiff had on
15  occasion dealt with these interferences in his contract with FedEx by direct and assertive
16  confrontation with these non-privies to his contract with FedEx, informing them, as well as
17  informing management personnel, that they were interfering with his job performance, and
18  thereby his contract with FedEx, by their conduct and to begin doing as he said.

19       54.    Plaintiff was expressly informed, in writing, by FedEx, as represented by its
20  management personnel, including Perry and Fraser, that he was to bring future such problems of
21  individuals interfering with his contract with it directly and immediately to the attention of its
22  management personnel, including Perry and Fraser and to not continue with further direct
23  assertion of authority. Such written expression was an explicitly described condition of Plaintiff's
24  continued employment with his equal partner to this contract, FedEx. Plaintiff cannot provide a
25  copy of this written expression. An original copy is in the possession of FedEx, in Plaintiff's
26  personnel file and Plaintiff has seen it and read it as recently as September 9, 2006. Plaintiff's
27  continued employment was threatened by Defendants. Because Defendants chose not to terminate
28  Plaintiff's employment at the time and, instead, drafted and imposed written conditions on his

- 19 -

EXHIBIT  C , PAGE 30

1  continued employment when certain circumstances arose, Plaintiff and Defendants had agreed on

2  specific terms of their previously at-will employment contract. These specific terms were written

3  and concerned the required course of action Plaintiff was expected to take when confronted with

4  individuals in the ULD By-Pass Lot who were interfering with Plaintiff's execution of his contract

5  with Defendants and implied the existence of a term of contract that Plaintiff would only be

6  disciplined or terminated from his employment under such circumstances if he did not follow such

7  instructions and report such interference to Defendants. These terms modified the at-will

8  employment contract that Plaintiff had originally with Defendants.

9      55.    At 1:30 AM, on or about January 26, 2006 Plaintiff returned from a four-week

10  period of disability suffered in an automobile accident. Immediately upon his return he contacted

11  FedEx management personnel in the person of Mark Scates and was immediately ordered by

12  Scates to begin again to maintain the nightly, written audit log of the freight that passed through

13  the ULD By-Pass Lot. This audit log had been neglected during the period of Plaintiff's absence.

14      56.    Later in the morning, on or about January 26, 2006, Plaintiff was ordered by Mark

15  Fraser to begin again to maintain the nightly, written audit log of the freight that passed through

16  the ULD By-Pass Lot, precisely in the identical manner that Scates had earlier ordered Plaintiff.

17      57.    On or about February 4, 2006 Plaintiff was executing the terms of his contract with

18  FedEx by engaging in the maintenance of said audit log when an individual not a party to

19  Plaintiff's contract with FedEx attempted to leave the area of the ULD By-Pass Lot with the

20  freight to which he had attached his vehicle. It was tracking the ingress and egress and destination

21  of this freight which was the object and purpose of the audit log Plaintiff was required by FedEx

22  to maintain as a verbally expressed term of his contract with it.

23      58.    Plaintiff instructed the individual to stop his vehicle so that Plaintiff could execute

24  the instructions Plaintiff had received from Scates and Fraser to log this individual's egress with

25  freight from the ULD By-Pass Lot.

26      59.    This individual did not stop and, since this individual had proceeded some distance

27  after Plaintiff first requested that he stop, it was necessary for Plaintiff to register his further

28

- 20 -

EXHIBIT __C__, PAGE 3 /

1    request of this individual that he stop at a higher decibel level, such higher decibel level which is
2    commonly referred to as a shout or "holler."

3        60.    The individual did stop and Plaintiff was required, as a condition of his
4    employment, to register this individual's name, the identifying information on the freight
5    container and its destination, and the time of his egress.

6        61.    This individual refused Plaintiff this information.

7        62.    This individual disconnected his tractor from this freight and left it standing there
8    obstructing any further egress of the freight behind it, all of which was expected at an aircraft for
9    loading aboard said aircraft, on time for a tightly scheduled departure.

10       63.    Such conduct on the part of this individual not a party to Plaintiff's contract with
11   FedEx interfered with Plaintiff's ability to satisfy his contractual obligation with FedEx and it was
12   necessary for Plaintiff to inform the supervisory personnel present in the ULD By-Pass Lot of the
13   incident and further inform these supervisory personnel that it would be necessary for Plaintiff to
14   write a report of the incident and to submit such report to management personnel as he had been
15   instructed. These supervisory personnel were Leo Cruz and Joe Rocha.

16       64.    Plaintiff did this.

17       65.    Plaintiff handed a copy of this report to Mark Scates, to David Perry and provided
18   a copy to Mark Fraser.

19       66.    The following Tuesday morning Mr. Fraser called Plaintiff and suspended him
20   pending investigation of the incident from the previous Saturday. This proved to be Plaintiff's last
21   day at work for FedEx. Plaintiff was fired the following Wednesday, February 15, 2006. Plaintiff
22   was informed that he had intimidated some unspecified individual in some unspecified manner.

23       67.    Defendants had no reasonable cause for suspicion that there had occurred any
24   intimidation of anyone that night by Plaintiff. There was an effort on Plaintiff's part to comply
25   with the express terms of his employment contract with Defendants by requesting information
26   from an individual in precisely the manner Plaintiff had been explicitly instructed and when he
27   experienced interference in performing the terms of his contract Plaintiff complied with the

28

EXHIBIT  C  PAGE 32

1   further explicit terms of his contract by reporting this interference to his employer's management

2   personnel in writing.

3      68.  By terminating Plaintiff's contract with it FedEx breached the explicit terms of said

4   contract by utilizing said terms in a manner precisely contrary to the plain meaning of said terms

5   and disciplining Plaintiff for his exact compliance with those terms, said discipline which was

6   used in combination with the discipline described in the first cause of action to this complaint as

7   being in violation of and destructive to the explicit and longstanding public policy of the State of

8   California, to constitute the reason for Plaintiff's termination from employment.

9      69.  FedEx breached this contract by explicitly describing in written expression the

10   precise manner in which it expected Plaintiff to address the interference of others not a party to his

11   contract with it of said contract, by further describing and twice re-emphasizing to Plaintiff its

12   expectation that he keep an audit log of the movement of its customer's freight in an out of its

13   workplace, then, when Plaintiff conducted himself in precisely the manner he was instructed,

14   disciplining him and, as a consequence, terminating his employment for following these precise

15   instructions, denying him the benefit of that bargain. Defendants, furthermore, denied Plaintiff

16   access to the greivance procedure to dispute the grounds for his third discipliary letter, said letter

17   which, in combination with two prior letters, was used to terminate Plaintiff's employment.

18   Plaintiff was simultaneously disciplined and fired. The explicit grounds for the termination were

19   the number of disciplinary actions taken against Plaintiff within a specific time period, not the

20   severity of any single instance of discipline. Plaintiff was not ever afforded the opportunity to

21   dispute the third instance of discipline before the decision was made to terminate his employment.

22      70.  As a consequence of FedEx's actions, as executed by it management employees,

23   Plaintiff has suffered contract damages in an amount to be proven in court.

24

25

26

27

28

EXHIBIT __C__ PAGE 33

1
2
3

### Third Cause of Action
### Breach of the Covenant of
### Good Faith and Fair Dealing

4    71.    Plaintiff here includes in this cause of action paragraphs 1 through 11 inclusive as

5    though they were written in their entirety.

6    72.    Plaintiff here includes in this cause of action any and all other sentences or

7    paragraphs inclusive that may contain allegations or information that is pertinent to this cause of

8    action as though they were written in their entirety and specifically paragraphs 49 through 69.

9    73.    Defendants maintain a "no lay-off" policy.

10    74.    Plaintiff performed his contract obligations to FedEx perfectly. All obligations

11    Plaintiff had been given by FedEx under their contract were met in full.

12    75.    Implied in Plaintiff's contract with FedEx was the requirement that Plaintiff nightly

13    instruct others in their duties and direct their activities.

14    76.    Plaintiff was not ever given a job title with the authority commensurate with the

15    aforementioned requirements of his job that he instruct others in their duties and direct the   .

16    activities of others.

17    77.    Plaintiff's subsequent conflicts with others in the workplace at FedEx who were

18    not parties to his contract with FedEx arose precisely because Plaintiff was not given such

19    commensurate authority as mentioned in the prior paragraphs to this cause of action. Plaintiff was

20    directed by his equal partner in contract to direct the activities of others, said others who were

21    equal partners in separate contracts as well with FedEx, such direction which was necessary to

22    complete the essential requirements of the overall operations of the entire Federal Express

23    corporation. FedEx Express' existence was based entirely on the nightly completion of various

24    and disparate tasks all aimed at meeting the scheduled departure times of given aircraft, as filled

25    as allowed by law with containers of freight, such freight which belonged on that given aircraft

26    and said containers which were as full as possible with said freight, and said freight which was

27    characterized by as high a priority for delivery time as was possible. All activity at FedEx was

28

- 23 -

EXHIBIT ___C___ PAGE 34

1  directed towards satisfying that nightly goal and all contracts for employment with FedEx were

2  entered into in order to provide the personnel necessary to satisfy that nightly goal.

3        78.    In January or February of 2003 Plaintiff became the most experienced member of

4  the "flight-side" side of the ULD By-Pass Lot operations. As before indicated, Plaintiff was given

5  vicarious authority over said operation by his manager Chaiyuth Muangkieng (Chai). Plaintiff

6  asserted this authority by directing the activities within the ULD By-Pass Lot operations from that

7  date forward of any individual who came into its parameters. Plaintiff experienced not constant,

8  but more than occasional interference with the performance of his contract with FedEx by the not

9  constant, but more than occasional refusal of his instructions to others. When said others refused

10  instructions given to them in the proper course of the nightly operations to fill the abovementioned

11  aircraft with the abovementioned freight they were in breach of their contract with FedEx and

12  threatening to bring Plaintiff into breach as well. It was incumbent upon Plaintiff, as he regarded

13  the situation, to protect his interests in his contract with FedEx to conduct his activities in

14  furtherance of the goal of filling aircraft with freight, by insisting that said interfering others do as

15  instructed or leave the ULD By-Pass Lot.

16        79.    This created conflicts of interest with the respective partners to the respective

17  contracts. The breach of one contract threatened the integrity of the other contract. Plaintiff was

18  threatened with disciplinary actions by Defendants for his efforts to protect the integrity of his

19  contract with FedEx. Plaintiff was thence given express, written instructions on the manner in

20  which he was in the future to proceed in protecting the integrity of his contract with FedEx.

21        80.    Towards the beginning of the year of 2005 Mark Fraser had a Ramp Agent

22  assigned to the ULD By-Pass Lot. A Ramp Agent is a supervisory position.

23        81.    Fraser explained that this was in order to create a clear chain of command within

24  the ULD By-Pass Lot operations. Fraser further explained that there should always have been a

25  Ramp Agent assigned to the ULD By-Pass Lot to supervise its operations and that he, Fraser, had

26  been mistaken all this time in not so assigning a Ramp Agent. Fraser reiterated this numerous

27  times. This lack of authority, but abundance of responsibility along with the necessity to direct the

28

EXHIBIT _C_, PAGE 35

1   activities of others was the entire cause of Plaintiff's disciplinary problems, none of which had

2   anything to do in the slightest with the quality of the performance of his job by Plaintiff.

3       82.    Plaintiff was still required by FedEx to maintain a written audit log of the ingress

4   and egress of freight from the ULD By-Pass Lot. This was explained to him by Fraser and by

5   Mark Scates to be the essential task for which he was responsible.

6       83.    It was during the performance of this task when, yet again, an individual under an

7   employment contract with FedEx separate and entirely distinct from Plaintiff's interfered with

8   Plaintiff's efforts to comply with the terms of his contract with FedEx.

9       84.    Plaintiff complied with the explicit instructions given to him in the written

10  expression of FedEx's expectations of him under Plaintiff's contract with it, should he experience

11  instances of interference with the performance of his contract with it. Plaintiff proceeded upstairs

12  to David Perry's office and handed him a written report of an individual's interference of the

13  operations of the ULD By-Pass Lot.

14      85.    Plaintiff relied on FedEx' written instructions to him of how to proceed in further

15  instances where individuals interfered with the performance of his job. Plaintiff was put into a

16  position where authority was required to be asserted. Plaintiff asserted that authority and was fired

17  by FedEx for following its instructions to him.

18      86.    As a consequence of FedEx's actions, as executed by it management employees,

19  Plaintiff has suffered contract damages in an amount to be proven in court.

20

21

22                          Fourth Cause of Action

23                      Discrimination Based on Disability in

24                              Violation of FEHA

25      87.    Plaintiff here includes in this cause of action paragraphs 1 through 11 inclusive as

26  though they were written in their entirety.

27

28

- 25 -

EXHIBIT C , PAGE 36

88.     Plaintiff here includes in this cause of action any and all other sentences or paragraphs inclusive that may contain allegations or information that is pertinent to this cause of action as though they were written in their entirety.

89.     Plaintiff was both discharged from employment and discriminated against by Defendants based on a physical disability and a failure to accommodate a physical disability. This physical disability limited a major life activity by preventing Plaintiff from working. It resulted from an industrial injury.

90.     On October 19, 2005 Plaintiff received a crushing and lacerating injury to the palm of his hand which resulted in a disability. This disability caused him to miss time from work. Such time from work that Plaintiff missed was entirely due to his employer's refusal to accommodate his injuries, even though Plaintiff was perfectly able to perform the essential duties of his job and had shown up at work willing to work. During Plaintiff's period of forced absence he was able and willing to work and was medically authorized to work. Plaintiff's duties with FedEx were not given to someone else in his absence. Indeed, during Plaintiff's absence Defendants fired one of the only two remaining individuals other than Plaintiff assigned to Plaintiff's work group, out of a one time work group of at least eight individuals. One of the essential duties of Plaintiff's job was simply to keep a written record of the destination of large container units that were to be loaded on to aircraft for transport to distant parts of the United States. Other instances of slightly disabling injuries suffered by Plaintiff resulting in identical limitations were accommodated by Plaintiff's employer by reducing his peripheral duties requiring physical exertion in excess of his limitations and restricting his duties to this essential and core task. The disability would not have been suffered if the injury had not occurred.

91.     The circumstances of the injury in question were such that Plaintiff's employer considered that it had been the result of an unsafe work act. The strictures of public policy against finding fault for industrial injuries notwithstanding, such unsafe work act was subjected to disciplinary action and this disciplinary action resulted in the termination of Plaintiff's employment. The specific unsafe act at issue was such that it was committed by two separate individuals. The separate, though cooperative, actions of distinct individuals were necessary for

- 26 -

EXHIBIT C , PAGE 37

1   the unsafe act in question to have occurred. Plaintiff does not know if the other individual

2   involved received discipline for the incident or not, but if Plaintiff did, then so should he have.

3   The injury certainly occurred because of an unsafe condition, but it was not because actions taken

4   by of either of the individuals involved that were unsafe. It is an employer's responsibility to

5   recognize and mitigate potential hazards and unsafe conditions in their workplaces and

6   Defendants were the ones failing in their duty that night.

7       92.    Be that as it may, the unlawful blame for the unsafe work act is irrelevant, or at

8   least entirely peripheral to this accusation of unlawful discrimination and subsequent discharge

9   from employment. Because discipline theoretically was given for the unsafe work act to both

10   individuals involved and there was only a single, discreet act that was taken resulting in this

11   discipline, Plaintiff was discriminated against because, in addition to the discipline received for

12   the unsafe work act, Plaintiff received discipline for the time he missed from work due to the

13   disability from the injury suffered as a consequence of the unsafe work act. A multiple number of

14   individuals cooperated in committing the unsafe work act in question, but only Plaintiff received

15   extra discipline not visited on others theoretically equally culpable for the ostensible unsafe work

16   act.

17       93.    Defendants, furthermore, denied Plaintiff access to the greivance procedure to

18   dispute the grounds for his third discipliary letter, said letter which, in combination with two prior

19   letters, was used to terminate Plaintiff's employment. Plaintiff was simultaneously disciplined and

20   fired. The explicit grounds for the termination were the number of disciplinary actions taken

21   against Plaintiff within a specific time period, not the severity of any single instance of discipline.

22   Plaintiff was not ever afforded the opportunity to dispute the third instance of discipline before the

23   decision was made to terminate his employment. The termination was justified on entirely

24   pretextual grounds and Plaintiff was summarily fired without the due process afforded by the

25   grievance procedure, such procedure which had been afforded all other disciplined employees.

26       94.    Such action on the part of Defendants were in violation of FEHA as administered

27   by the Department of Fair Employment and Housing, from which agency Plaintiff received a

28   Right to Sue Letter.

EXHIBIT  C , PAGE 38

1    95.    Because of defendants' conduct Plaintiff has suffered monetary damages in an

2    amount to be proven, but which includes backpay and benefits of employment as well as frontpay

3    and benefits and which must consider the destruction of Plaintiff's finances and credit, the

4    reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff

5    seeking employment with Defendants in the first place..

6    96.    Because of defendants' conduct Plaintiff has suffered consequential damages in an

7    amount to be proven, but which must consider the destruction of Plaintiff's finances and credit,

8    the reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff

9    seeking employment with Defendants in the first place.

10    97.    Because of defendants' conduct Plaintiff has suffered emotional damages in an

11    amount to be proven, but which include the worry and despair Plaintiff has experienced at the

12    destruction of his finances, as well as the development by Plaintiff of a horrendous and seemingly

13    chronic insomnia, such condition for which Plaintiff has sought medical attention.

14    98.    Because of defendants' conduct Plaintiff has suffered other, unspecified damages

15    in an amount to be proven. Because defendants' conduct was intentional, malicious and cruel and

16    unconscionable, an amount of punitive and exemplary damages should be awarded to Plaintiff to

17    deter such unmitigated cruelty by FedEx and other employers against their employees in the

18    future.

19

20                        **Fifth Cause of Action**

21                **Discrimination Based on Disability in**

22                    **Violation of The Public Policy of**

23                        **The State of California**

24

25    99.    Plaintiff here includes in this cause of action paragraphs 1 through 11 inclusive as

26    though they were written in their entirety.

27    100.    Plaintiff here includes in this cause of action any and all other sentences or

28    paragraphs inclusive that may contain allegations or information that is pertinent to this cause of

- 28 -

EXHIBIT  C  , PAGE  39

1　action as though they were written in their entirety and specifically includes paragraphs 89

2　through 94 inclusive as though they were written in their entirety.

3　　　101.　Because of defendants' conduct Plaintiff has suffered monetary damages in an

4　amount to be proven, but which includes backpay and benefits of employment as well as frontpay

5　and benefits and which must consider the destruction of Plaintiff's finances and credit, the

6　reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff

7　seeking employment with Defendants in the first place..

8　　　102.　Because of defendants' conduct Plaintiff has suffered consequential damages in an

9　amount to be proven, but which must consider the destruction of Plaintiff's finances and credit,

10　the reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff

11　seeking employment with Defendants in the first place.

12　　　103.　Because of defendants' conduct Plaintiff has suffered emotional damages in an

13　amount to be proven, but which include the worry and despair Plaintiff has experienced at the

14　destruction of his finances, as well as the development by Plaintiff of a horrendous and seemingly

15　chronic insomnia, such condition for which Plaintiff has sought medical attention.

16　　　104.　Because of defendants' conduct Plaintiff has suffered other, unspecified damages

17　in an amount to be proven.Because defendants' conduct was intentional, malicious and cruel and

18　unconscionable, an amount of punitive and exemplary damages should be awarded to Plaintiff to

19　deter such unmitigated cruelty by FedEx and other employers against their employees in the

20　future.

21　　　　　　　　　　　　**Sixth Cause of Action**

22　　　　　　　　　**Discrimination Based on Race in**

23　　　　　　　　　　　**Violation of FEHA**

24　　　105.　Plaintiff here includes in this cause of action paragraphs 1 through 5 inclusive as

25　though they were written in their entirety.

26　　　106.　Plaintiff here includes in this cause of action any and all other sentences or

27　paragraphs inclusive that may contain allegations or information that is pertinent to this cause of

28　action as though they were written in their entirety.

EXHIBIT C, PAGE 40

107.    In addition to the disability discrimination claim, Plaintiff was the victim of racial discrimination by Federal Express. Disciplinary actions taken by Plaintiff's employer subsequent to verbal complaints made by him about racial hostility directed against him were retaliatory. Due to the negligent supervision of Federal Express management personnel a racially hostile work environment was created for Plaintiff and when he informed management of it and explained his feelings to them Plaintiff was immediately subject to a rapid submission of disciplinary action such that a disciplinary letter was entered into his personnel jacket once every twelve workdays for the last three months of his employment with Federal Express. The disciplinary actions taken against Plaintiff were opportunistic and pretextual and two of them were the direct result of the aforementioned single instance of an unsafe work act and its contingent injury. On October 18, 2005, the day before Plaintiff's workplace injury, Plaintiff's disciplinary record was clean. Plaintiff had no active discipline in his personnel record and his attendance record was at approximately 98%. Plaintiff's employment was terminated on February 15, 2006 for receiving a third disciplinary letter to his jacket within the time span of a year. Plaintiff missed 21 days from work recovering from the October, 2005 injury and another 28 days recovering from an automobile accident suffered on December 26, 2005 and from which Plaintiff returned to work on January 26, 2006. Plaintiff was present at work in the time span between October 18, 2005 and February 15, 2006 for a total of only 35 days. In the prior four years of Plaintiff's employment with Federal Express he had received perhaps three disciplinary letters to his personnel record. One of these was for suffering work related injuries as well and another was for tardiness, such tardiness which was caused by the incompetence of the shuttle service FedEx required its employees to use to get to work. FedEx blamed this tardiness on its employees anyway.

108.    There had been, however, multiple instances where Plaintiff was accused by the company of conduct which was regarded as disrespectful of other employees. In fact Plaintiff's personnel record was quite replete with them. They were not considered ever serious enough to terminate Plaintiff's employment and they resulted from negligent supervision by management personnel in defining Plaintiff's work responsibilities, such negligence which resulted in Plaintiff being required as a condition of his employment to direct the activities of others, but being denied.

EXHIBIT ___C___, PAGE _41_

1  the authority to compel their adherence to his instructions at the risk of their being considered

2  insubordinate.

3      109.    In June of 2002 Plaintiff was recruited by management personnel to assist in

4  operating their "Cold Storage" facility. This required that Plaintiff direct the flow of freight

5  containers to the proper gate for loading on to aircraft. It was necessary for Plaintiff to determine

6  from information accompanying the freight what its destination was and to either retain it in "Cold

7  Storage" for delivery to a gate by personnel on a later shift or for immediate delivery on Plaintiff's

8  shift. This was a somewhat specialized task, not that it required any particular genius, but it did

9  require a great deal of familiarization with the documentation accompanying the freight and how

10 to determine its priority for loading. If mistakes were made, then disciplinary action was

11 threatened. Plaintiff did not make mistakes. He took my job very seriously and I did my job very

12 well.

13      110.    Because Plaintiff directed the delivery of freight but did not do the actual

14 delivery it was an essential duty of his job to coordinate the activity of others. The job was

15 designed this way. The work environment was extremely fast paced and required a great deal of

16 cooperation amongst participants. This cooperation was very often not forthcoming. Plaintiff had

17 zero toleration of other individuals entering his assigned workspace and interfering with his

18 operation of it. Because the essential duties of the job required that Plaintiff act with some

19 authority in directing the activities of others and because Plaintiff was not ever given an actual job

20 title with such authority Plaintiff was very often left with dealing with individuals who

21 deliberately ignored his instructions and left him scrambling to find someone who would do what

22 he asked them. Often this resulted in individuals of a cooperative nature being saddled with a

23 much larger workload than the individuals who deliberately ignored Plaintiff's instructions to

24 them. This, in turn, created a situation where unfair workloads caused resentments against

25 Plaintiff and where Plaintiff felt that he had to personally address a situation when individuals

26 came out to his workspace while he was in the middle of a very busy effort in trying to control its

27 operation and deliberately interfered with it.

28

EXHIBIT  C , PAGE 42

1       111.   Plaintiff always addressed these situations in a brusque yet efficient manner.

2   Plaintiff felt that, because he was dealing with other adults, adult behavior was expected of them.

3   The childish behavior of some of them in refusing his instructions when they were in the middle

4   of an operation it was his job to control greatly interfered with Plaintiff's ability to keep his job by

5   doing it properly. Plaintiff did his job perfectly. This is repeatedly reflected in Plaintiff's job

6   evaluations and in Plaintiff's perfect record in tracking the freight that came through his operation.

7   Plaintiff knew precisely what the goal of the operation was and he always conformed his behavior

8   to accomplishing that goal. This goal was to fill aircraft and other freight delivery vehicles as full

9   as possible with the freight that belonged on them in order for them to meet their departure

10  schedules and to do this with the safety of Plaintiff and others utmost in his mind. Numerous times

11  Plaintiff headed off problems which would have delayed this goal. Any delay of this goal entirely

12  defeated this goal, and this goal had to be met every night, or someone had some explaining to do.

13  Plaintiff's goal was to make absolutely sure every night that it was not Plaintiff who had to do this

14  explaining.

15      112.   Plaintiff's attitude toward these individuals was apparently considered disrespectful

16  by some of them and Plaintiff's behavior received some complaints. Plaintiff's managers

17  instructed him that he was to come to said managers when other individuals behaved

18  uncooperatively. Managers around that FedEx facility were very scarce and for Plaintiff to "come

19  to them" on every instance of uncooperation by others was highly impractical. Nevertheless,

20  Plaintiff continued to guarantee by his consistent outstanding performance perfection in the

21  operation of "Cold Storage." In spite of the above-described constant interference of others, the

22  "Cold Storage" operations proved to be the backbone of the AM shift operations.

23      113.   Employees are equal partners in contract with their employers and are not required

24  to be personally submissive to an employer's management representatives, or, under their orders,

25  to be personally submissive to other employees. Employees are required to suborder their activity

26  to their employers operations and that is the required extent of an employee's subordination.

27  Iplaintiff always subordered his activity while employed at FedEx. As described above, Plaintiff

28  was also required as an essential element of his duties to instruct the activities of others. Plaintiff

EXHIBIT C   PAGE 43

1   was never given the position of authority to require the subordination of the activities of others,

2   however. Positions such as Ramp Agent or Team Leader authorized such individuals holding

3   them to so suborder the activities of others and to discipline such others for insubordination,

4   should such others be uncooperative when instructed in their activities within the overall order of

5   the operation. Plaintiff's manager Mark Fraser stated on numerous occasions that the job that

6   Plaintiff was expected to do should always have been filled by an individual with precisely such

7   authority. Plaintiff filled such a position for years and years without such authority and Plaintiff

8   was informed by Fraser numerous times that Fraser should never have allowed such a situation of

9   formal lack of positions of authority as existed in the AM "Cold Storage" operation to continue. It

10  was this necessity to exercise authority that the company refused to give Plaintiff that was at the

11  root of the problems which arose concerning Plaintiff's behavior in conducting his business at

12  FedEx.

13      114.    Plaintiff was fired by FedEx after informing their management personnel,

14  specifically Mark Fraser, when said management personnel asked that Plaintiff felt that the reason

15  behind these problems was the fact that he is a middle aged white male instructing a largely

16  minority workforce and that the basis for the lack of cooperation that was underlying the problems

17  was that the individuals whose activities Plaintiff was required to direct, but whose activities he

18  was not given the authority to direct, were perfectly aware that Plaintiff had no formal authority to

19  direct them. Plaintiff told Fraser that such uncooperative individuals were "dissing whitey" by

20  their non-cooperation with Plaintiff. Plaintiff told Fraser that Plaintiff felt that such uncooperative

21  individuals felt that Plaintiff was acting without authority and that Plaintiff felt that he was

22  entitled to act that way because he is white, or more precisely that Plaintiff behaved with a sort of

23  reverse "uppitiness."

24      115.    "Dissing whitey" is the exact phrase that Plaintiff used with the management

25  personnel in authority over him in explaining his feelings about the situation. Plaintiff informed

26  Fraser that Plaintiff actually did not take what Plaintiff described as "dissin' whitey" personally.

27  Plaintiff informed Fraser that he understood very well the resentment felt towards "whitey" by a

28  largely African-American workforce at that facility, as well as the derivative resentment felt by

- 33 -

EXHIBIT ___C___, PAGE 44

1   other non-white personnel who identified their own racial or ethnic exclusion with the specific

2   historical and at this late date still shamefully unaddressed oppression experienced by African-

3   Americans. There are a number of incidents on record where Plaintiff was subjected to derogatory

4   comments about his race. Plaintiff told Mark Fraser at Fraser's invitation that these documented

5   instances hardly scratched the surface. Plaintiff informed Fraser that Plaintiff hardly equated these

6   expressions directed at him of racially implicated resentment with the historical expression

7   throughout American history of very often murderous and always physically coercive white

8   supremacy, which formed the basis for that resentment. Plaintiff informed Fraser that such

9   equation within our society of these respective racial resentments was shallow and utterly

10  ahistorical and that Plaintiff had always tolerated such attitudes as reflected by "dissing whitey" as

11  part of a Black man's birthright. Though not entirely verbatim, this was the subject matter of an

12  actual conversation Plaintiff had with Mark Fraser which took place in Fraser's office in the

13  weeks and months immediately prior to the termination of Plaintiff's employment. During the

14  context of this conversation Plaintiff informed Mark Fraser that, although he understood and

15  tolerated the expressions of racial resentment of African-American individuals directed at him

16  when they recognized that Plaintiff had no authority to instruct their activities, but ordered them

17  around anyway, it was the legal responsibility of the employer to not discriminate between their

18  employees on the basis of race and that disciplinary actions taken against Plaintiff for a situation

19  which Defendants allowed, through their admitted negligence, to fester was, in Plaintiff's mind,

20  racially motivated discrimination in employment on their part and that Plaintiff expected

21  Defendants to behave towards him in conformance with the law.

22      116.   This conversation between Plaintiff and Fraser took place sometime in September

23  or early October of 2005. It took place in the context of an investigation into yet another incident

24  involving Plaintiff's assertion of control over his work environment. Plaintiff received no formal

25  disciplinary action for this incident, even though serious accusations of physical assault were

26  made against him. The incident involved an individual who had made prior and wholly unfounded

27  accusations against Plaintiff of using racial epithets while at work. The incident also involved this

28  individual's immediate supervisor, who came out to Plaintiff's workplace and asked him in a

-34-

EXHIBIT __C__, PAGE __45__

1  rhetorical question what Plaintiff's problem was with his employees. This supervisor remembered

2  exactly who Plaintiff was from this aforementioned previous incident, taking place more than a

3  year before. These individuals worked on a prior, but overlapping shift. Plaintiff informed his

4  immediate manager Mark Fraser at this time that he would not be a fallguy for their negligent

5  supervision of their workplace. Plaintiff explained to Fraser at Fraser's invitation that the admitted

6  fact that they had left it up to Plaintiff to perform a job that should have been filled by an

7  individual with at least a Team Leader level of authority was entirely what was behind all of the

8  problems that Plaintiff was having in the "Cold Storage" operation, none of which were

9  performance problems and all of which concerned what Plaintiff explained to Fraser Plaintiff felt

10  to be racially tinged subjective perceptions of him by other employees. Plaintiff explained to

11  Fraser that they expected performance from Plaintiff in completing their assigned tasks and that

12  they got that performance and much more and that Plaintiff would be subject to negative

13  personnel action if he did not perform. Plaintiff was under a great deal of pressure from

14  Defendants to perform and Defendants had allowed the staffing of "Cold Storage" to be so

15  depleted that, at the time of Plaintiff's termination, Plaintiff was the only individual left who was

16  assigned to the "flight side" aspect of the operation there. Because of the expectations Defendants

17  had placed on Plaintiff and which Plaintiff had met, but which had brought Plaintiff into more

18  than occasional, but far less than constant conflict with those whom Ploaintiff had to direct, but

19  over whom Plaintiff had no authority, Plaintiff felt, and expressed those feelings to Fraser, that

20  Defendants were threatening Plaintiff's continued employment in such a manner that brought

21  them under the prohibition against racial discrimination, because Plaintiff thought the conflict was

22  based on racial resentment at Plaintiff's presumption of superior authority. Because of the rapid

23  engineering of Plaintiff's forced departure within 35 actual days at work for the remainder of his

24  employment after the before-mentioned industrial injury which forms the other aspect of this

25  lawsuit, and the proximity in time of the initial instances of discipline which constituted the

26  pretext for that finally forced departure, as well as the illegality of that pretext as entirely founded

27  on physical disability and work place injury, Plaintiff expressed his feeling to Fraser that this

28  constituted retaliation in his opinion for raising issues of racially motivated harassment with

- 35 -

EXHIBIT C    PAGE 46

1    Defendants. The Defendants utilized and distorted every incident involving Plaintiff, including

2    workplace injury and its contingent absence in order to manufacture a record of disciplinary action

3    to form a pretext that they used to end Plaintiff's employment with them on February 15, 2006.

4        117.    Such pretext constitutes a violation of the FEHA as administered by the

5    Department of Fair Employment and Housing, from which agency Plaintiff received a Right to

6    Sue Letter.

7        118.    Because of defendants' conduct Plaintiff has suffered monetary damages in an

8    amount to be proven, but which includes backpay and benefits of employment as well as frontpay

9    and benefits and which must consider the destruction of Plaintiff's finances and credit, the

10   reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff

11   seeking employment with Defendants in the first place..

12       119.    Because of defendants' conduct Plaintiff has suffered consequential damages in an

13   amount to be proven, but which must consider the destruction of Plaintiff's finances and credit,

14   the reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff

15   seeking employment with Defendants in the first place.

16       120.    Because of defendants' conduct Plaintiff has suffered emotional damages in an

17   amount to be proven, but which include the worry and despair Plaintiff has experienced at the

18   destruction of his finances, as well as the development by Plaintiff of a horrendous and seemingly

19   chronic insomnia, such condition for which Plaintiff has sought medical attention.

20       121.    Because of defendants' conduct Plaintiff has suffered other, unspecified damages

21   in an amount to be proven.Because defendants' conduct was intentional, malicious and cruel and

22   unconscionable, an amount of punitive and exemplary damages should be awarded to Plaintiff to

23   deter such unmitigated cruelty by FedEx and other employers against their employees in the

24   future.

25

26

27

28

- 36 -

EXHIBIT C , PAGE 47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Seventh Cause of Action

### Discrimination Based on Race in

### Violation of the

### Public Policy of

### The State of California

122.    Plaintiff here includes in this cause of action paragraphs 1 through 5 inclusive as though they were written in their entirety.

123.    Plaintiff here includes in this cause of action any and all other sentences or paragraphs inclusive that may contain allegations or information that is pertinent to this cause of action as though they were written in their entirety and specifically includes paragraphs 107 through 117 inclusive as though they were written in their entirety.

124.    Such pretext as described in the previous Cause of Action constitutes a violation of the public policy of the State of California.

125.    Because of defendants' conduct Plaintiff has suffered monetary damages in an amount to be proven, but which includes backpay and benefits of employment as well as frontpay and benefits and which must consider the destruction of Plaintiff's finances and credit, the reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff seeking employment with Defendants in the first place..

126.    Because of defendants' conduct Plaintiff has suffered consequential damages in an amount to be proven, but which must consider the destruction of Plaintiff's finances and credit, the reconstruction and maintenance of said finances which it was the sole purpose for Plaintiff seeking employment with Defendants in the first place.

127.    Because of defendants' conduct Plaintiff has suffered emotional damages in an amount to be proven, but which include the worry and despair Plaintiff has experienced at the destruction of his finances, as well as the development by Plaintiff of a horrendous and seemingly chronic insomnia, such condition for which Plaintiff has sought medical attention.

128.    Because of defendants' conduct Plaintiff has suffered other, unspecified damages in an amount to be proven.Because defendants' conduct was intentional, malicious and cruel and

EXHIBIT __C__. PAGE 48

1   unconscionable, an amount of punitive and exemplary damages should be awarded to Plaintiff to

2   deter such unmitigated cruelty by FedEx and other employers against their employees in the

3   future.

4                                    **PRAYER FOR RELIEF**

5       WHEREFORE, Plaintiff prays judgment as follows:

6       1.      For compensatory damages including past and future loss of earnings, bonuses,

7   commissions, deferred compensation, and other employment benefits, damages relating to

8   physical, mental and emotional distress, and other special and general damages according to

9   proof;

10      2.      For punitive damages according to proof;

11      3.      For interest, including prejudgment interest, at the prevailing legal rate;

12      4.      For attorneys' fees and costs under Cal. Govt. Code §12965(b) and as otherwise

13  permitted under law;

14      5.      For costs of suit; and

15      6.      For such other and further relief as the Court may deem proper.

16

17

18      July 31, 2007

19

20

                                                    Brian Patrick Tucker
21                                                  Plaintiff in Pro Per

22

23

24

25

26

27

28

                                        - 38 -

1

## Verification

2      I, Brian Patrick Tucker, am the Plaintiff in the above-entitled action. I have read the

3  foregoing complaint. And know the contents thereof. The same is true of my own knowledge,

4  except as to those matters which are therein alleged on information and belief, and as to those

5  matters, I believe them to be true.

6      I declare, under penalty of perjury under the laws of the State of California that the

7  foregoing is true and correct.

8

9  <u>July 31, 2007</u>

10

11                                                          _Brian Tuck_

12                                              Brian Patrick Tucker
                                                Plaintiff in Pro Per

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 39 -

EXHIBIT __C__, PAGE __50__

Notice to Federal Express and FedEx Express, Plaintiff Brian Patrick Tucker reserves the right to seek $1,000,000.00 in punitive damages when Brian Patrick Tucker seeks a judgment in the suit filed against you in Alameda County, California. Case No. HGO07311338

Brian Patrick Tucker
Pro Per

EXHIBIT ___C___ PAGE S 1